UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN KING,

Plaintiff,

v.

Case No.
HON.

LEXMARK INTERNATIONAL, INC., a foreign corporation; and MEGAN DIMMER, a Michigan resident,

Defendants.

______________________________________/

E. MICHAEL MORRIS (P31547)
Attorney for Plaintiff
4000 Town Center, Suite 900
Southfield, MI 48075
(248) 353-7900

______________________________________/

## **COMPLAINT and JURY DEMAND**

NOW COMES Plaintiff, STEVEN KING, by and through his undersigned counsel, and states for his Complaint as follows:

## **PARTIES**

1. Plaintiff, STEVEN KING ("Plaintiff"), is a resident of Washtenaw County, Michigan; was born on July 30, 1960; and at all times material to this Complaint, was within the class of persons protected from age and/or gender discrimination.

2. Defendant, LEXMARK INTERNATIONAL, INC. ("Lexmark") is a Delaware corporation, with its principal place of business in Lexington, Kentucky.

3. Defendant, MEGAN DIMMER ("Dimmer"), is, upon information and belief, a resident of Oakland County, Michigan.

## JURISDICTION AND VENUE

4. Jurisdiction is vested in this Court by virtue of 28 U.S.C. § 1331 (civil action arising under a law of the United States); 29 U.S.C. § 621, *et seq*. (Age Discrimination Employment Act ("ADEA")); and Title VII (gender discrimination).

5. Venue in this action is vested in this Court by virtue of, *inter alia*, 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Michigan.

6. Plaintiff was issued a Right to Sue letter by the Equal Employment Opportunity Commission ("EEOC") as to age and gender discrimination within the past 90 days.

## COMMON ALLEGATIONS

7. Plaintiff was hired by Lexmark in April, 2008 as a senior account manager. Plaintiff was interviewed and hired by Arnie Kirby ("Kirby"), a Lexmark regional manager based in Nashville, Tennessee.

8. At the time of hire, Plaintiff was told that his Michigan territory was "cold"; that the only real Lexmark customer in the territory was the State of Michigan; that there was no "run rate," (*i.e.*, no existing business to rely upon for sales in the assigned territory); and that it would take at least 18 months until Plaintiff could develop the territory to a point where it would make money. Kirby further told Plaintiff not to count on making any real income for the years 2008 and 2009.

9. One of Lexmark's biggest challenges in the State of Michigan was that it was not an approved vendor on the bid list put out by the Regional Education Media Centers ("REMC"), an organization based out of Lansing, Michigan. Upon information and belief, REMC is an organization that was commenced in or about the 60s; and vendors such as Lexmark must be on

the REMC bid list to obtain any business from the K-12 public school system in Michigan for printers.

10. Lexmark, as a vendor, could not directly bid the K-12 school business, but had to be included as part of a bid as an approved vendor by a reseller.

11. Generally, the REMC bid list is published in June and effective as of October of each year. In the past, because REMC had consistently chosen Hewlett-Packard ("HP"), a major Lexmark competitor, resellers were reluctant to use Lexmark on any K-12 bid.

12. Plaintiff diligently went to work on both his territory and trying to find ways to convince one or more resellers to place Lexmark on the REMC bid list as an approved vendor.

13. Plaintiff also commenced working on other accounts, not subject to REMC approval, including the Michigan Department of Human Services ("DHS") and the Detroit Public Schools ("DPS"). Plaintiff also worked on the Chrysler account, which was assigned to him in 2009, but had little activity in 2009.

14. For 2009, REMC decided not to again bid printer products, but just continued with the past approved vendors and/or resellers. Therefore, Lexmark did not have an opportunity in 2009 to be placed on the bid list for the K-12 school system.

15. Lexmark did have an exception that allowed it to bid state contracts, and this why Plaintiff diligently worked with the DHS. In 2008, Plaintiff did obtain a sale to DHS. Kirby, Plaintiff's supervisor at the time, was ecstatic and stated that Lexmark did not expect such a result so early in Plaintiff's work in his assigned territory.

16. After REMC decided not to bid out printers again in 2009, Plaintiff had to adapt and began working with both the DHS and DPS accounts to a greater degree. As noted above,

Plaintiff began making sales to DHS. At the same time, Plaintiff began offering trial printers, selling printing solutions, and finding printing needs for the DPS.

17. In or about January, 2009, Lexmark changed to a geographic supervisory system; Plaintiff was assigned a new supervisor, Defendant Megan Dimmer.

18. Dimmer, approximately 34 years old, immediately favored younger and female salespersons. By way of example, Plaintiff notes the following facts:

(a) In or about September, 2009, Dimmer terminated an older, male salesperson (Bob Hepke). Dimmer then replaced this male with two younger females. Before his termination, Hepke had, upon information and belief, found, identified and closed one of Lexmark's largest customers (DMC) in 2007. A female was hired in early 2008 to take over the DMC account responsibilities from Mr. Hepke at Dimmer's direction. It was so obvious that Dimmer had been and was favoring younger, female salespersons that she was compelled to make the statement, "I tried to hire a man, but it just did not work out."

(b) Upon information and belief, during a span of approximately 2 years, Dimmer terminated 4 males, replacing each with a younger female.

(c) Dimmer repeatedly made critical, disparaging and inappropriate remarks about male salespersons, questioning, among other things, the competency and knowledge of a particular male salesperson.

(d) Plaintiff explained to Dimmer what he had been told at the time of his hire, *i.e.*, that it would take time to build up his territory. However, Dimmer became increasingly hostile and offensive towards Plaintiff, even placing Plaintiff on a Performance Improvement Plan ("PIP") in August, 2010. This was an attempt to set

Plaintiff up for firing due to his age and gender. Two days after Plaintiff was placed on the PIP, he landed one of Lexmark's biggest sales ever (to DPS). Dimmer then removed Plaintiff from the PIP plan.

(e) However, similar to the transfer of Hepke's DMC account, Dimmer refused to allow Plaintiff to work as project manager on the DPS account. Instead, Dimmer took over the account, delayed shipments on the account, participated in a scheme to cheat Plaintiff out of his commissions on the account, and then terminated Plaintiff's employment.

(f) Upon information and belief, after Plaintiff was terminated at the end of December, 2010, two younger women were then assigned to take over Plaintiff's accounts.

(g) Dimmer's attitude and demeanor towards Plaintiff and other male employees was much different. In fact, Dimmer's treatment was harsh and offensive on numerous occasions toward Plaintiff due to both his age and gender. As an example, when Plaintiff asked to take the day off for a colonoscopy, Dimmer made jokes to other employees about the matter. When Plaintiff asked for a day off to attend his wife's surgery, Dimmer harshly told Plaintiff that he did not need to take a day off for his wife's surgery and that he could just be available by phone. After Plaintiff took the day of for his wife's surgery, Dimmer sent Plaintiff a scathing e-mail at approximately 11:00 a.m. on the morning of the surgery.

(h) Plaintiff was only given 2 weeks of vacation. Plaintiff learned that a younger female was given 4 weeks of vacation. When Plaintiff mentioned this, Dimmer stated that Plaintiff would get 3 weeks when he turned 50. However, when Plaintiff

turned 50, Dimmer notified Plaintiff that, "only due to company policy," would he be given an additional week of vacation, but otherwise Dimmer was unable to change the vacation time. Yet, upon information and belief, it was Dimmer that had negotiated and/or approved the 4 weeks for the younger female.

(i) Plaintiff had a pre-planned vacation in July, 2010. Just before Plaintiff was leaving on that vacation, Dimmer told Plaintiff that she intended to put Plaintiff on a PIP plan when he returned from the vacation. Upon information and belief, Dimmer did this maliciously in an attempt to ruin Plaintiff's vacation. There was absolutely no need or justification for Dimmer to notify Plaintiff prior to his vacation that she intended to place Plaintiff on a PIP after his vacation.

(j) Upon information and belief, Dimmer imposed a wholly arbitrary set of demands upon Plaintiff as part of a double standard by both Dimmer and Lexmark.

19. Plaintiff diligently worked to obtain business from DPS for Lexmark in both 2009 and 2010. During this time, Dimmer was increasingly hostile and negative, constantly telling Plaintiff that he was wasting his time in trying to obtain the DPS business.

20. Plaintiff repeatedly told Dimmer, in both 2009 and 2010, that it was imperative that Lexmark find a reseller that would place Lexmark as an approved vendor on the REMC bid list. Dimmer should have been directly involved in assisting Plaintiff's efforts to get on the REMC list. In addition to advising Dimmer, Plaintiff was diligently attempting to locate such a reseller.

21. At some point in 2010, Plaintiff obtained business with Chrysler. Plaintiff asked Dimmer about a possible toner supplier. Dimmer suggested Precision Products out of Grand

Rapids, which was also part of Dimmer's territory but not Plaintiff's territory. Plaintiff then used Precision Products on the Chrysler account.

22. At no time in 2009 or 2010 did Dimmer ever suggest either Precision Products or any other reseller as a means to get on the REMC approved vendor bid list.

23. In or about June 2010, Plaintiff took Dimmer on a call to REMC in Lansing. Plaintiff (once again) inquired how Lexmark could get on the REMC bid list. (Plaintiff had set up the meeting with REMC for this very purpose.) REMC notified Plaintiff and Dimmer that Precision Products had already placed Lexmark on the bid list earlier that year, *i.e.*, sometime in the spring.

24. After the REMC meeting, Dimmer stated that Plaintiff should immediately start selling Lexmark products to K-12 organizations. This statement by Dimmer reflected her extremely poor knowledge of K-12 sales because purchasing decisions had already been made for the following school year. In reality, getting placed on the REMC bid list was only the first step in pursuing K-12 sales.

25. Plaintiff promptly began talking to Precision Products, arranging mailings, going to conferences, and doing all of the things necessary to successfully sell Lexmark products in the next 12-18 months that it would take after being placed on the REMC bid list.

26. At an industry conference in Traverse City in 2010, many K-12 decision makers as to purchasing printers were present. These were the higher level education persons. At or about the same time, however, there was a conference in Livonia attended by school principals. Dimmer elected to go to the conference in Traverse City, and sent Plaintiff to Livonia.

27. Dimmer invited a female sales representative with her to Traverse City, who she claimed covered the Grand Rapids school district. However, neither Dimmer nor this female

salesperson had any substantial knowledge about K-12 sales. Upon information and belief, neither Dimmer nor the female salesperson had ever been engaged in such sales.

28. In reality, Dimmer decided to take a female to Traverse City rather than Plaintiff, even though it was definitely in Lexmark's best interest to put Plaintiff before the decision makers who would be important for K-12 sales of Lexmark's products. This was more evidence of Dimmer's blatant gender discrimination.

29. During 2010, Plaintiff continued to work closely with DPS. In fact, Plaintiff actually assisted in the writing of bids by DPS. Plaintiff knew the bid requirements intimately, which was a huge advantage when it came to obtaining the business.

30. Toshiba was selected as the reseller for the DPS business. Plaintiff had several meetings to assist Toshiba in writing their bid response, and provided coaching and assistance to respond to the DPS bid that Plaintiff had helped to write. All the while, Dimmer remained highly negative about the chances to obtain the DPS business and critical of Plaintiff's efforts, indicating that he was wasting his time.

31. In or about August, 2010, Dimmer placed Plaintiff on a PIP. About one week later, Plaintiff obtained the DPS business, believed to be one of the largest Lexmark sales ever. The sale involved approximately 4,000 printers and, upon information and belief, was valued internally at Lexmark at approximately $7,000,000.

32. After the DPS sale, Lexmark suggested that Plaintiff was at approximately 576% of his 2010 quota. In reality, because the product should have shipped before the end of 2010, Plaintiff was at 752% of his quota. (Dimmer took over the project and supply chain, and, upon information and belief, mismanaged and/or delayed shipment of some items into 2011.)

33. Shortly after Plaintiff obtained the DPS sale, Dimmer took Plaintiff off the PIP.

34. Plaintiff's reprieve from Dimmer's harassment, discrimination and abuse was, however, short-lived. Dimmer then began to paper Plaintiff's file with nitpicking and absurd complaints, including the following:

(a) Dimmer claimed that she did not like the format Plaintiff used for reporting purposes, even though Dimmer had previously approved the format.

(b) Dimmer claimed that Plaintiff should be calling on major accounts more frequently, even though Plaintiff explained that many of the accounts had stated that they only wanted calls 1-2 times annually, and that Plaintiff had already done so and risked offending those accounts.

(c) Dimmer falsely claimed that Plaintiff had misrepresented his involvement in Lexmark being placed on the REMC approved vendor list.

(d) Dimmer started to impose new requirements on Plaintiff, *i.e.*, in addition to a weekly summary, Dimmer began to demand details for each sales call made by Plaintiff.

(e) Dimmer claimed that Plaintiff was sending e-mails to target accounts with "too many documents attached" that covered "far too many messages."

(f) Dimmer claimed that the fact that a certain customer suggested that he did not know much about particular Lexmark offerings meant that this customer ". . . did not see value in [Plaintiff's] previous discussions."

(g) Plaintiff threatened to place Plaintiff on a second PIP, even though Plaintiff had just blown away his sales quota for 2010.

(h) In November, 2010, just before Thanksgiving and less than 3 months after Plaintiff had blown away his 2010 sales quota by 500% to 700%, Dimmer notified

Plaintiff that his employment with Lexmark would cease as of the end of December, 2010.

35. After Plaintiff's landmark DPS sale, Dimmer and Lexmark management notified Plaintiff that they intended to "adjust" Plaintiff's sales commission percentage, after the fact, to reduce Plaintiff's commissions on the DPS sale. In fact, Dimmer and/or Lexmark did adjust Plaintiff's commissions, thereby cheating Plaintiff out of significant commissions on his DPS sale. This type of blatant greed was in violation of Michigan law and Plaintiff's commission rights (*see* Count III, *infra*).

**COUNT I**

**VIOLATION OF 28 U.S.C. § 621 (ADEA) AGAINST LEXMARK**

36. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 35 above as though fully set forth herein.

37. Plaintiff was performing the functions of his position in a diligent and successful manner and consistent with the terms under which Plaintiff was hired.

38. When dealing with employees under 28 U.S.C. § 632, including Plaintiff, Lexmark had the duty to treat such employees in a non-discriminatory manner with regard to the terms and conditions of employment; and the duty not to discrimination against such employees in the terms or conditions of employment because of their age.

39. Lexmark breached its duty by, *inter alia*, terminating Plaintiff's employment, disparately treating Plaintiff as to terms and conditions of employment, and favoring younger workers over Plaintiff as to both terms and conditions of employment. Further, Plaintiff's age was a determining factor in such decisions, actions or omissions.

40. Upon Plaintiff's termination, Plaintiff was replaced by one or more younger persons.

41. Lexmark has violated the ADEA as provided in 29 U.S.C. § 621, *et seq*.

42. The conduct of Lexmark was outrageous and willful behavior, entitling Plaintiff to liquidated (double) damages under 29 U.S.C. § 626(b).

43. As a direct, natural, proximate and foreseeable result of the discriminatory conduct of Lexmark, Plaintiff has suffered substantial losses, including lost income and wages.

44. As provided by 29 U.S.C. §626(c)(1) and (2), Plaintiff is entitled to bring a civil action in said situation for such legal or equitable relief which will effectuate the purposes of this chapter.

**COUNT II**

**CLAIM UNDER TITLE VII - GENDER DISCRIMINATION (AGAINST LEXMARK)**

45. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 44 above as though fully set forth herein.

46. When dealing with employees, Lexmark had a duty at all times to not discriminate against such employees as to terms and conditions of employment on account of the gender of an employee.

47. Lexmark breached such duty by, *inter alia*, terminating Plaintiff's employment and treating Plaintiff differently as to the terms and conditions of employment on account of Plaintiff's gender. Plaintiff's gender was a determining factor in such decisions, acts or omissions.

48. Upon Plaintiff's termination, Plaintiff's duties and/or accounts were assigned to female salespersons.

49. Lexmark's conduct, acts and omissions were in violation of Title VII. Further, the conduct of Lexmark was willful and intentional so that Plaintiff is entitled to recover punitive and/or exemplary damages.

50. As a direct, natural, proximate and foreseeable consequence of the discriminatory conduct of Lexmark, Plaintiff has suffered substantial losses, including lost income, wages and such other damages as recoverable under Title VII.

**COUNT III**

**CLAIM FOR AGE AND/OR GENDER DISCRIMINATION UNDER <u>MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT (AGAINST LEXMARK)</u>**

51. Plaintiff incorporates by reference the allegations contained in paragraph 1 through 50 above as though fully set forth herein.

52. When dealing with its employees located in Michigan, including Plaintiff, Defendants Lexmark and Dimmer had the duty to treat such employees in a non-discriminatory manner with regard to the terms and conditions of employment; and the duty not to discriminate against such employees as to terms and conditions of employment because of their age and/or gender.

53. Defendants Lexmark and Dimmer breached their duties by, *inter alia*, terminating Plaintiff's employment, and disparately treating Plaintiff as to terms and conditions of his employment. Plaintiff's age and/or gender were determining factors in such decisions, actions or omissions.

54. Defendants have violated Michigan's Elliott-Larsen Civil Rights Act.

55. As a direct, natural, proximate and foreseeable consequence of the discriminatory conduct of the Defendants, Plaintiff has suffered substantial losses, including lost income and wages, mental anguish, stress and anxiety.

**COUNT IV**

**BREACH OF CONTRACT AND/OR VIOLATION OF MICHIGAN'S SALES REPRESENTATIVE COMMISSION ACT, MCLA 600.2961d (AGAINST LEXMARK)**

56. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 55 above as though fully set forth herein.

57. The Michigan Sales Representative Commission Act ("SRCA") specifically protects commissioned sales representatives. MCLA 600.2961. The Act provides, in part, as follows:

> (2) The terms of the contract between the principal and sales representative shall determine when a commission becomes due.
>
> (3) If the time when the commission is due cannot be determined by a contract between the principal and sales representative, the past practices between the parties shall control or, if there are no past practices, the custom and usage prevalent in this state for the business that is the subject of the relationship between the parties.
>
> (4) All commissions that are due at the time of termination of a contract between a sales representative and principal shall be paid within 45 days after the date of termination. Commissions that become due after the termination date shall be paid within 45 days after the date on which the commission became due.

MCLA 600.2961.

58. The Act allows for actual damages and, if a principal is found to have intentionally failed to pay commissions when due, additional damages in an amount equal to two times the amount of commissions due or $100,000, whichever is less. The Act also allows for an award of attorney fees and costs.

59. Lexmark has violated this Act because it has failed to pay Plaintiff the commissions he is due within 45 days after his termination. By Plaintiff's calculations, Lexmark

owes an additional $440,100 in pre-termination commissions.[1] Under the Act, Lexmark can be liable for both additional damages and costs and attorney fees.

60. The Lexmark plan provided for a lesser sales commission for sales "above 150%." While the plan purported to allow Lexmark the right to alter the quotas or the sales compensation plan ". . . at any time for any reason," this would not mean that Lexmark could make such alterations after a sale had already been procured. This would be contrary to Michigan law as noted below. The Lexmark sales compensation plan also provided a time for payment when a sales representative left Lexmark. We quote as follows:

> Leaving Lexmark - An individual who is leaving Lexmark will generally be paid through the month that they terminate if the termination date is the 15th day or later in the month of departure. Payment of commissions will generally be through the prior month of departure if the termination is prior to the 15th of the month of departure.

61. The above language defines when Plaintiff should have been paid his commissions; and contemplates that commissions will be paid post-termination for sales or accounts procured pre-termination.

62. The Lexmark plan also provided as follows:

> The quotas are assigned as a full year measure and are not expected to change during the annual period. Management, however, reserves the right to adjust quota assignments at its discretion. If a quota assignment is adjusted during the year, the change will be communicated to the employee by his/her management team.

63. This language states the rule that quotas ". . . are not expected to change during the annual period." Hence, the quota of Plaintiff should not have been adjusted. In any event,

[1] Using the 752% over quota number, and assuming proper management of the supply chain, would yield a total commission of $588,092, less $147,992 paid, which equals $440,100 still due. This is what Plaintiff is owed. Using Lexmark's admitted over quota number of 576%, would yield a total commission of $374,031, less a payment of $147,992 which equals $226,039.

the discretion to adjust the quota of Plaintiff could only be as to future sales or accounts, and certainly not as to a past sale or account. Otherwise, the terms of the compensation package would be illusory because it would permit Lexmark to, after the fact, deprive Plaintiff or other representatives of earned commissions. In any event, Michigan law does not allow such a result. *See*, below.

64. Next, under the procuring cause doctrine, Plaintiff would also be entitled to receive post-termination commissions on customers he procured for Lexmark. Therefore, Plaintiff requests an accounting as to all 2011 sales or shipments to DPS or other customers serviced by Plaintiff. This should include any additional product or services of any kind.

65. After Plaintiff secured the large DPS sale, Lexmark and Dimmer embarked upon a scheme to cheat Plaintiff out of his already earned commissions on the sale. Defendants advised Plaintiff that they would adjust his sales commission percentage given the sale.

66. On or about January 5, 2011 (after Plaintiff's termination), Plaintiff received an e-mail with the subject "Commission Treatment for DPS." Plaintiff was told that his commissions were being "adjusted." This e-mail from Bart Andolino stated, in part, as follows:

> As Megan and I have communicated, all large sales are inspected by the commissions team and if quota for an account is much smaller than the deal ultimately achieved, <u>original quotas are subject to adjustment</u>.

67. The Andolino e-mail also acknowledged:

> <u>Without adjustment</u>, your attainment for 2010 would have been <u>approximately 576% [actually 752%] of goal</u>. We are assuming that actual revenue for DPS is approximately $2.6M against a goal of only $340K, <u>which is obviously why adjustment is necessary</u>. . . .
>
> <u>With the goal adjustment, you will finish at approximately 201% of hardware and 248% of CM</u>. Total variable commission payment for the year will be approximately $153,000.

68. Lexmark apparently believes that it can arbitrarily adjust commissions after sales have already been made. This is directly contrary to the well-accepted Michigan law, including decisions of both the Michigan Supreme Court and the Michigan Court of Appeals. In fact, for over 50 years the Michigan Supreme Court has recognized that there is a duty of good faith and fair dealing that is applicable to commissioned sales representatives. Michigan courts have held that a manufacturer or employer cannot change the rules of compensation midstream or otherwise cheat sales representatives after sales have been procured. This is more than simple fairness or common sense, it is the law in Michigan.

69. Pursuant to Michigan law, Lexmark clearly owes Mr. King commissions on both pre-termination and post-termination sales through DPS, a customer procured by Mr. King's efforts. For a good overview of Michigan law in this area, see the following article: "Unsupportable Limitations on Michigan's Procuring Cause Doctrine" in the case of *Roberts Associates, Inc. v. Blazer International Corp.*, 2004 Mich. St. L. Rev. 101. This law review article discusses, among other things, the leading case in Michigan on this subject, namely *Reed v. Kurdziel*, 352 Mich. 287 (1958). In *Reed*, a manufacturer attempted to deny commissions to a sales representative that had procured numerous customers. The Michigan Supreme Court set forth the procuring cause doctrine, which has been cited repeatedly in Michigan commission cases, as follows:

> An examination of the law with reference to commissions allowed agents or brokers seems to indicate that it is difficult to determine a set line of decisions, particularly with reference to the right of an agent with an exclusive agency to recover commissions on sales made where he is the procuring cause. However, when they are viewed as a whole and brought into proper focus, they disclose the law applicable to the question is well settled and that the seeming confusion results from the application of that law to the particular

> facts of the specific cases in question. 12 ALR2d 1360, 1363, states as follows:
>
>> The relationship between agent or broker and principal being a contractual one, it is immediately apparent that whether an agent or broker employed to sell personalty on commission is entitled to commissions on sales made or consummated by his principal or by another agent depends upon the intention of the parties and the interpretation of the contract of employment, and that, as in other cases involving interpretation, all the circumstances must be considered. This rule is recognized and stated in the American Law Institute, 2 Restatement, Agency, § 449, Comment a.
>
> It would appear that underlying all the decisions is the basic principle of fair dealing, preventing a principal from unfairly taking the benefit of the agent's or broker's services without compensation and imposing upon the principal, regardless of the type of agency or contract, liability to the agent or broker for commissions for sales upon which the agent or broker was the procuring cause, notwithstanding the sales made have been consummated by the principal himself or some other agent. In Michigan, as well as in most jurisdictions, the agent is entitled to recover his commission whether or not he has personally concluded and completed the sale, it being sufficient if his efforts were to procuring cause of the sale. In Michigan the rule goes further to provide if the authority of the agent has been cancelled by the principal, the agent would nevertheless be permitted to recover the commission if the agent was the procuring cause. [Citations omitted.]

*Reed*, *supra*, at 294-295. For more recent application of the *Reed* procuring cause doctrine, see the case of *Petroff v. Grand Blanc Tractor Sales, Inc.*, 2009 Mich App LEXIS 2322. In *Petroff*, the Michigan Court of Appeals again affirmed that *Reed* sets forth the correct legal principle of fair dealing, which prevents a principal from unfairly appropriating the value of a broker's services without compensation.

70. Federal cases have also recognized the *Reed* doctrine as applicable in Michigan. See, for example, *Patterson v. Citation Corporation*, 2000 U.S. App. LEXIS 10142 (CA 6, 2000).

71. As for any attempt by an employer or a manufacturer to change the terms of compensation after a customer had already been procured, see *Militzer v. Kal-Die Casting Corp.*, 41 Mich App 492 (1972). In *Militzer*, the manufacturer attempted to change a 5% commission rate to a sliding scale <u>after</u> a large customer had been procured. This appears to be precisely what Lexmark is attempting to do with respect to Mr. King's commissions by its so-called "adjustment" after the DPS account was procured. The *Militzer* court, after citing the *Reed* case, emphatically rejected such machinations:

> McCullough testified that plaintiff was to receive 5% on everything sold to Eaton after plaintiff had procured Eaton for a customer even if plaintiff had done nothing in selling a particular part. This was a policy which defendant practiced with all of its representatives. The evidence clearly reveals that plaintiff brought the Eaton people in and indeed was directly responsible for the first two part orders. Only after this initial contact did the defendant assign its sales manager as a technical "assistant" to the Eaton account.
>
> If defendant had desired to limit plaintiff's commission in terms of time or amount it could have done so, preferably in writing, in the original agreement. Instead it proposed a new arrangement after the Eaton account had been obtained and after much of plaintiff's time and energy had already been expended.
>
> The defendant's policy against written agreements with its manufacturing representatives seem to facilitate "renegotiation," but it cannot be permitted to deny its representatives the compensation agreed upon. Plaintiff is entitled, and we so hold, to a 5% commission on all Eaton sales occurring on or before plaintiff's termination date. In addition plaintiff is entitled to a 5% commission on all reorders, occurring either before or after his termination, on parts which were first sold on or before that date.

*Militzer, supra,* at 495-496; *see also, Patterson, supra* ("It does not matter that the SIP, which allowed reassignment of accounts at any time without further obligation to the originating salesperson, had been rescinded at the time of Patterson's termination. The accounts in question, we have already determined, were still governed by the SIP, which could not be rescinded retroactively.")

72. Based on the foregoing, Lexmark's decision not to pay Plaintiff his full commissions on the DPS account or sale was a breach of contract based on Lexmark's own policies and commission language.

73. In addition and/or in the alternative to the foregoing, Lexmark's conduct violated the SCRA, entitling Plaintiff to double damages and attorney fees, as well as actual damages.

74. In addition, because Plaintiff was the procuring cause of the DPS account, Plaintiff should be entitled to commissions on all sales to such account for a reasonable period of time consistent with Michigan law.

75. As a direct, natural, proximate and foreseeable consequence of Lexmark's breach of contract and/or violation of the SCRA, Plaintiff is entitled to damages, including the commissions to which Plaintiff was and is entitled, double damages, attorney fees, and such other relief as the Court deems warranted and just.

WHEREFORE, Plaintiff prays that this Honorable Court make and enter a judgment in favor of Plaintiff and against Defendants, and each of them, in whatever amount to which this Court determines Plaintiff is entitled, together with costs, interest, attorney fees, punitive and/or exemplary damages, and such other relief as the Court deems warranted.

MORRIS & DOHERTY, P.C.

s/ *E. Michael Morris*
E. MICHAEL MORRIS (P31547)
Attorneys for Plaintiff
4000 Town Center, Suite 900
Southfield, MI 48075
(248) 353-7900
emmorris@morris-dohertypc.com

Dated: February 14, 2012

**JURY DEMAND**

Plaintiff, through undersigned counsel, hereby demands trial by jury in this matter.

MORRIS & DOHERTY, P.C.

s/ *E. Michael Morris*
E. MICHAEL MORRIS (P31547)
Attorneys for Plaintiff
4000 Town Center, Suite 900
Southfield, MI 48075
(248) 353-7900
emmorris@morris-dohertypc.com

Dated: February 14, 2012